This is Michelle v. Yale University. Good morning, Your Honors. Yves Golan on behalf of Appellants. Yale never offered an online undergraduate program for $55,500. No student has ever accepted or bought, enrolled in a $55,000 Yale undergrad online program. Nonetheless, on the basis of Yale's pricing of eight online summer classes, the district court determined that that pricing had conclusively established what Yale would have charged for an online undergrad program and declined to consider our evidence, our contrary evidence, looking at past sales of comparable products. The court then awarded summary judgment. We contend that this was error. We asked the court to reverse, because first, that's simply not the summary judgment standard. Second, a couple of months after the district court's decision, this court decided by NASCO, where the court clarified that an existing price differential is highly, well, may be highly relevant to the issue of damages. But we have to look further. We have to look at how similar that online pricing was for that school and see if it's similar enough. Here we have not simply their offering an online class. The undergraduate regulations specifically reserved for the university, the right to suspend operations when certain circumstances warrant. Now, the first question is, is that an implicit contract with the student? And so I'd like you to address that. It seems that under our precedent it would be, but I want to hear your views on it. So that's also a question that we have struggled with. Does this fall within a contract, or is this more of an unjust enrichment? Eventually. Well, no, the student goes to the school provided with the regulations and agreeing to abide by them. And one of those regulations says that if public health requires, the university can suspend operations and issue refunds in its judgment. So first let's start with, are you disputing that that is the contract that governs the school and students' relationship? The brief makes a number of arguments there, but I think that it is fair to say that, yes, students agreed to the temporary suspension provision. OK, now, when we have that, I mean, I gather you're disputing that the pandemic was a public health emergency. Why do you think the university didn't have the discretion if it could suspend operations to modify operations, as it did here by going online rather than in class or shut down altogether? Two things. First, under Vynasko and Goldberg, we have to start with the actual language. The actual language says that Yale has the discretion, as far as refunds, for a temporary suspension. Yale examined the COVID situation, and Yale's president testified that here in this situation, there was no suspension. And therefore, the COVID spring 2020 simply doesn't fall within that clause. Will they backtrack from that at some point, and you're saying the ambiguity creates a question here? Well, Yale's council argues that there was a suspension. But as far as the evidence is concerned, Yale's president had said from the beginning that this is not a suspension. He continued. He testified as well that there is not a suspension. Well, what was it? What was it if it wasn't a suspension of its operations? I think that he called it a change to his operations, a modification of his operations. But the temporary suspension provision covers only. And that gets to my question. If they have the ability, in their discretion, to suspend operations, why doesn't that necessarily encompass the ability to alter their operations for public health reasons, not just for any reason? Well, it's because that's just simply not within the terms of that clause. And as they had suspended operations, shut down completely, no online, nothing, then they could have withheld tuition refund, but not if they offered a modified program. Well, I think another important word there is temporary suspension. So something like a blizzard or snow days or something like that, the clause does not contemplate a fundamental change to the entire educational program for 47% of the semester. And that's what happened here. The clause here just doesn't contemplate the situation of a contract essentially becoming impossible. You have referenced Reynasco and Goldberg. And of course, both of those cases were applied in New York law. We're making our eerie assessment in New York law. Is there anything about Connecticut law relative to any of the issues in this case where you've identified what you believe to be meaningful differences between Connecticut law as it relates to the relationship between student and university contractual obligations, promises, et cetera, and New York law? And if so, can you cite these cases? Yeah, I have found that nothing that would indicate a distinction that makes a difference. The elements of unjust infringement and promissory estoppel, I think are laid out in the court's decision, the district court's decision at special appendix 11, special appendix 11. And you'll see that these requirements are pretty much the same as what Reynasco considered under New York for unjust enrichment. And Reynasco, if you remember, wasn't just a breach of contract-like case. It was also an unjust enrichment case. Yeah, the district court was willing to identify a question with respect to suspension. It granted the judgment for Yale based on it finding no question as to damages. And I understand that was based in part on the fact that there's no allegation that the online instruction was not valuable to the student and also the student's re-enrollment in 2020-21 when the student knew that the classes would be online. Help me out with why damages cannot be decided as a matter of law. Well, under both the Second Circuit and Supreme Court precedent, we look at the sale of comparable products, not just the sale of, just taking Yale's price for summer classes. We have to look broader. Well, Yale thinks its classes are unique and can't be compared to anybody else's. Well, I agree. I think it's quite unique, and that's just the point. The undergraduate Yale program, the fall, spring, normal program is, it's a very special program. And summer is just different. But you don't allege anything about how being online resulted in him learning less than being in class. I'm not saying you couldn't, but there is nothing in this complaint, right? Well, exactly, because that would be speculation. And in Michelle's deposition. Not necessarily. We've had a string of these cases. And for instance, in cases where students were taking classes that required online or in-person theater productions or laboratory work, they've made allegations. I don't see anything like that in this complaint. So, if you look at Michelle's deposition, I think he tried to explain it as best he could there. It was that, look, I was online in the second half of spring semester. I don't know what I would have learned if I was in-person. I only know what I did learn because I was online. So, I can't really make that determination. I can't say for myself. It's just, he's a very thoughtful young man. How's he gonna prove it in trial then? Well, our claim isn't based on a lower or lesser education or any kind of educational malpractice. It is simply the financial injury that the students paid a premium price for in-person education. And what they received instead was something of a lower market value. Can I ask about the unjust enrichment claim? Doesn't your client have to show that it was going online that unjustly, that enriched the university? And if I'm right about that, I mean, it's the going online that has to have enriched. How did you raise a material issue of fact on that point? I guess that is one way to look at it. The way that I look at it is that the unjust enrichment was that Yale received money that was supposed to be for the higher priced in-person education and they gave something of a lower value instead. And also, in this situation, we find that Yale was able to reduce its expenses considerably because of COVID. And so it kind of like got a double benefit. But then- But I think they say that they were not enriched by going online, that in fact, they paid a lot to provide the service that students had during that period. Well, and I guess that's kind of my point. Like we bring out our facts, we cite their financial and the memo by their- Do you have any, if I take that narrow view of what unjust enrichment means, have you really raised an issue that suggests that they were unjustly enriched? That's my question. Yes, and I'm sorry if I'm misunderstanding the question. I'm really trying to answer it. Because they received something and did not give back what the students set for that money. The avoided costs are the measure of the unjust enrichment? So that is one thing that you could measure it by. The other thing is the amount that Yale took in without giving what the students expected in return. So here we've got tuition of $55,000 a year. Let's make life easier. And let's say that $10,000 for the second half of spring semester for in-person school. And let's make it easy. And let's say that online program would have been only worth $7,000. So Yale benefited by taking that $3,000 and not giving it back to students, even though it could only partially perform its contract, understandably. And am I right, you mentioned that RINASCO was both unjust enrichment and contract. But in RINASCO, that flowed from the absence of the force majeure clause, right? That was the possibility of an impossibility defense. And so that's how we got there. Am I right in understanding that the viability of your unjust enrichment claim depends upon us essentially agreeing with the district court that the force majeure clause wasn't invoked here, that there wasn't a suspension of operations pursuant to that? I don't think it's possible to do that. I don't think it's necessary because the temporary suspension provision isn't a force majeure clause. It doesn't put the risk onto the students. But I guess my question is, do we have to agree with you on that in order to get to the unjust enrichment as an independent freestanding? Right, I don't believe that we do because we also have testimony from Yale's president, vice provost, and chief of staff saying that there was no contract here for in-person services. And therefore, an unjust enrichment claim would not conflict with an explicit contract or a clear contract for in-person education. That is, there is no contract for in-person education. That was an expectation that they had in giving this money. And unjust enrichment would allow them to get back what is unfair for Yale to keep. And as Yale's witnesses had testified, there is no contract here for in-person education. The undergraduate regulations, the one with the temporary suspension provision, that has terms like the student's code of conduct, the date that payment is due, things like that. It doesn't have anywhere in there anything about in-person instruction. Good morning, your honors. May it please the court, I'm Jonathan Fryman of Witten and Dana on behalf of Yale University. With me at council table is Emmett Gillis. Your honors, the case below, of course, was decided on the basis of financial detriment, and I'm happy to answer questions related to that and prepare to discuss it. But in the time since the district court's decision, of course, both Ranasco and Goldberg came down. We believe Goldberg has made this a much easier case for reasons much along the lines of the questions that Judge Raji asked earlier. It can be affirmed on the basis of the suspension provision. How can it be given Mr. Svorny's repeated statements that this wasn't a suspension? Well, so first of all, your honor, we have an acknowledgement here that Mr. Michel knew about the university regulations. They are a part of the implied contract. And so really, what your question is going to is, was it triggered or not in the light of this particular testimony? The facts themselves are undisputed. Everybody knows what happened. We had the COVID pandemic, classes stopped happening in classrooms, people left campus, classes happened remotely. So those are the facts, and they're absolutely undisputed on both sides. The question then is, what is the legal? But I think the adversary is saying that the agent of the university, the president, is saying this was not a suspension. Do we give that no consideration? Can a jury give that no consideration? I think this is a question of law as to whether in fact things were suspended. And in fact, if you go back to the Ranasco decision itself, the Ranasco decision twice, even though it finds there's not an applicable force majeure clause there, the Ranasco decision, both at page 197, note 13, and also at page 201, says there was a campus-wide suspension of in-person courses, services, facilities, and activities. At 201, it says there was a decision to suspend in-person operations.  of what happened across the board at universities. There was a suspension of in-person activities. There was a suspension of room and board. Classes didn't happen in classrooms. Labs didn't happen in labs. So there was a suspension. Really, the way you would have to- So you're saying that the facts are undisputed. It's simply irrelevant that the president said that there wasn't a suspension because this is a legal determination about the effect of the suspension provision. Well, I'll say that, and I'll say two other things. One, the president, of course, is not a lawyer. He's not pretending to interpret the suspension provision or the contract. He's just answering factual questions at a deposition. So it's not like there's some binding determination of what the contract means on the basis of what a lay witness, himself a faculty member as well as an administrator, thinks about a legal clause. Secondarily, as we noted in our briefs, this is not a situation where what he says somehow, when he clarifies what he says, that becomes a dispute of material fact. He starts by saying, no, the whole university didn't shut down. We didn't suspend everything. We did not abandon the academic purpose, which is what Goldberg looks at in the context of pace. We continued the academic purpose of the university. And then, in context, when he's asked, well, but did you suspend in-person classes? Yes. Did you suspend room and board? Yes. That's a clarification. That's not a contradiction. Well, the plaintiff, though, as I understand it, takes the position that what suspension means under this contract is a short-term cessation of classes, whether for a few days or a week. She's hypothesizing an adverse weather effect where it would be dangerous for people to get to class, et cetera. So we are talking about not a suspension necessarily in the common use of the word, but as it was used by the parties in this agreement. Now, Yale is the superior, is the superior contracting party and the drafter of this agreement. And so the plaintiffs say it's not a suspension. Your president says it's not a suspension, and yet you want us to find, as a matter of law, that it was a suspension. Well, there's nothing in the clause, Your Honor, that suggests that it's something that's limited in time. Why is, but they're suggesting that's what everybody understood at the time it was drafted, that this was not a suspension, for instance, for an entire year, but a suspension for a week, a couple of days, maybe a month, but not this much larger suspension. Why is that something we can decide as a matter of law as opposed to having to look into what the party's understanding was? Well, I think you, just as you did in Ronasco, you can read it to mean this, but clearly a public health emergency envisions something that's more than just a few days long. A public health emergency can last longer. Yes, we know that in retrospect because of the COVID pandemic, but we know it from other public health situations as well, from the Ebola pandemic, from the 1918 flu, et cetera. There are some things that are very bad that somehow doesn't give the university less discretion to invoke the clause. The clause still applies. It applies to things that can't be imagined in advance. That's what's clear to public health, serious public health and safety problems that require the suspension of some university programs or operations. So, I mean, the notion that somehow, oh, if it's only something that required us to close for a week, then the university could have done a suspension. But if it's something that was so dangerous that it was gonna kill more than a million Americans, then Yale didn't have the ability to close. That makes no sense, Robert, I think, as a matter of law. And I think, you know, here we have, they could have said Yale acted in bad faith in the way it implemented this suspension. In fact, the district court invited them to do so after dismissing their complaint. The district court said the suspension gives Yale discretion. Go ahead, amend your complaint, plead the bad faith that Yale factually, you think, engaged in when it invoked this clause and when it decided to give very generous refunds for room and board above and beyond the actual cost of room and board for financial aid students, but decided not to refund tuition. When Yale decided to refund for things it was no longer providing, room and board, but not to refund for things it was providing, teaching, classes, degrees. Go ahead, plead the bad faith. They made a choice. Their choice was not to plead bad faith because they have nothing that they could have pled under Rule 11. There was no bad faith. Yale did exactly what this court asked in Goldberg and Rinasco, continue the academic mission. Yale continued to educate Americans, the next generation of Americans,  on transitioning to online education. I think the suspension clause applies, Your Honor. Thank you. I'm happy to answer any questions about financial detriment to the extent this panel believes them relevant. I'll make a brief overview for you and then perhaps sit down before my time is over, have some questions. But here's the brief overview. They needed to come up with a theory of damages. That's required by damages disclosure. It was required by a specific order of the district court. Discovery was overseen by both Judge Hall and Judge Merriam before she was elevated to this court. And what Mr. Michel said is, no, I can't do it. I don't know what the difference is. But their theory that they put forward was a difference in market value, okay? And they said, we're gonna have an expert who's going to provide economic models. And here's the two kinds of sophisticated economic models we're gonna give you. One is hedonic regression analysis. I had to look that one up the first time. The second one was conjoint analysis. These are things that are used in Lanham Act cases, in antitrust cases. They're ways that economists help lay jurors understand sophisticated and difficult economic questions that lay jurors do not have the knowledge to do. I didn't have the knowledge to do. I didn't know what a hedonic regression analysis was. And so they said, we're gonna do that. And then their expert came forward and said, I could do that. Those are possible here. But their expert never actually did that. And discovery was closed. Can I jump in? I read the brief and I understand that argument. And I just, I want to take advantage of our limited time to ask, I understand the expert didn't come through with the promised analysis. And I understand that we can't really put much stock in the things the expert said he would do that didn't then happen. I'm trying to figure out whether there are remaining tidbits that are sufficient to support the possibility that a jury could conclude that the substitution of a remote and online experience for an in-person experience has some value, that there is some injury from denying that. And I'm looking at things like the US News and World Report showing the average price per credit for online versus in-person. I'm looking at, for two different years, the average cost for an online degree versus in-person. Why aren't those enough to at least subject to all the great contra evidence that you would bring to bear and subject to your cross-examination as well? Why wouldn't that be enough that a jury could conclude that there's some injury, even if it's not to anything the degree is nominal? They couldn't win on that even if we didn't show up for trial for two reasons that are fundamental reasons in federal law. One is that they require, to begin with, to give the jury something by which it can actually determine financial detriment or damages, not speculate. Just looking at a US News and World Report that says, oh, this happened at the University of Arizona, this happened in a different program at a different year, that's asking for speculation. The hedonic regression or conjoint analysis would give them a basis to actually make a determination. But this is just speculation. And some things federal law realizes, this is why we have Daubert. Some things federal law realizes you need an expert for. You're not going to be able to prove a Lanham Act claim that, oh, well, actually, this imaginary product versus that product, they have a market differential just by saying, oh, well, here's an article I saw about it in the Houston Chronicle. That doesn't allow a jury to prove that. They don't have the ability to get past speculation. They don't have expert testimony. They don't have any theory of damages except one that they promised to do and never did. So for that reason, they failed to meet an element of their claims, financial detriment, which is a requirement of both equitable claims, which is a question you never need to get to because the suspension provision, in fact, displaces the need to address that. Thank you, Your Honors. Your best. Thank you, Your Honors. So first, as to the suspension provision, whether there was a temporary suspension at Yale is absolutely a factual question. What happened in NYU is a factual question. And the court's decision in Rinasco, well, statement in Rinasco that at NYU it was a suspension, in no way describes necessarily what happened at Yale. Yale's president, however, testified as to what happened. And he said that it was not a suspension. And he had exactly this clause in mind when he said that it wasn't a suspension. We cite in our briefs an email that he wrote saying, don't call it closed because as soon as you do, that's when you're going to have to issue rebounds. He had exactly this situation in mind. So in the spring semester, he said that there was no suspension. In his depositions, he says that there was no suspension. But now Yale wants to argue that absolutely there was a suspension. And you know, try. That wouldn't be the only change of position in the course of this case, I suppose. Yes. But there are two ways in which I understand you to be questioning whether it was a suspension. One is its duration. You're saying a suspension would have been a shorter period of time, not an entire semester. What's your evidence for that? So the suspension provision states temporary suspension, the word temporary. And here, should I continue? OK. And ADO rate just didn't have a temporary suspension. We had one lasting the entire rest of the spring semester. The other way it's different is that they didn't close down entirely. They did online classes. And I had asked you earlier, and I'm still not sure of your answer, why the discretion to suspend everything didn't necessarily encompass the ability to modify. Well, I think that this case perhaps provides a good example. Yelp provided substitute services. It modified. But it's not claiming that it has the power to determine what modifications are appropriate. But they could have shut down altogether and not given you your tuition back. You want the contract construed to mean that and only that? Oh, no, no. So the temporary suspension provision does not state that it is the only way in which a refund for this type of situation, let's say, can come up. It never uses the word only. Similar analysis was done in Jones versus Tulane, where it was looking at the tuition refund clause, where a student must withdraw from the university to get a refund. And the Pitt Circuit in Jones pointed out that, listen, this clause is addressing this one situation. It's not claiming to address every situation in which a refund is appropriate. I think also Reinasco's decision, as far as the disclaimer is concerned, also gives quite a bit of guidance in looking at the precise terms there and seeing if the language there can take on as much as what the school claims. There were a couple of points regarding damages being speculative. And I see that I'm out of time. I would refer your honors to the voice, which is cited in the briefs, and that specifically rejects that argument. And also that in our damages disclosure, we've repeatedly said that damages here can be proven by factual evidence. We never said that we're going to use an expert for damages. The expert that we had was only for class certification, not for damages, which is a fact question, as the Supreme Court and Second Circuit repeatedly put it. Thank you both, and we'll take the matter under advisement.